## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

JORGE RIVERA-HERRANS, individual
1407 Pannell Drive
Apartment C
Aberdeen, Harford County, Maryland 21001

      Plaintiff,

    v.

BLAIR RUSSELL PRODUCTIONS LLC
1718 Capitol Avenue
Cheyenne, Wyoming 82001

      Serve On: Resident Agent
      Anderson Registered Agents
      1716 Capitol Ave Suite 100
      Cheyenne, Wyoming 82001

      And

BRP RECORDS, LLC
1718 Capitol Avenue
Cheyenne, Wyoming 82001

      Serve On: Resident Agent
      Anderson Registered Agents
      1716 Capitol Ave Suite 100
      Cheyenne, Wyoming 82001

      And

DOES 1 through 10,
c/o Lavely & Singer P.C.
2049 Century Park East
Suite 2400
Los Angeles, California 90067

      Defendants.

CASE NO.:

## COMPLAINT AND JURY DEMAND

1

Plaintiff Jorge Rivera-Herrans ("Plaintiff" or "Rivera-Herrans"), by and through his counsel, hereby alleges against Defendants Blair Russell Productions LLC ("BR Productions"), BRP Records, LLC ("BRP Records"), and Doe Defendants 1 through 10, inclusive (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

*"When Does A Man Become A Monster?"*

1.      These lyrics, authored by Plaintiff Rivera-Herrans and sung by his character Odysseus in *EPIC: The Troy Saga*, are apropos to the facts of this case.

2.      In particular, this case arises from the shameful actions of an individual named Blair Russell ("Russell"), who – after ingratiating himself into Rivera-Herrans' life under false pretenses – has **outrageously** and **unlawfully** attempted to **plunder** Rivera-Herrans' rights in and to the musical works that Rivera-Herrans wrote and recorded, including Rivera-Herrans' right to be paid from those works.

3.      Although Russell entered Rivera-Herrans' world as a purported hero, offering to help and mentor Rivera-Herrans in his musical pursuits, it has now become clear that Russell was actually the <u>villain</u> in the narrative. Stated otherwise, the man whom Rivera-Herrans initially trusted to guide his career has now become a monster, seeking to harm and frustrate Rivera-Herrans' very existence as an artist and creator.

4.      Accordingly, for the reasons described at length herein, Rivera-Herrans has been forced to filed this lawsuit, through which he seeks (1) a declaration of his joint rights in recordings that Russell has falsely taken sole credit for, and (2) the recovery of substantial monies that Russell has refused to pay him in connection with those recordings.

**THE PARTIES**

5.      Plaintiff Jorge Rivera-Herrans is, and at all times relevant hereto has been, an individual who resides in the State of Maryland.

6.      Defendant BR Productions is, and at all times relevant hereto has been, a limited liability company organized under the laws of the State of Wyoming, with a principal place of business located in Cheyenne, Wyoming.  Plaintiff is informed and believes that Russell is the owner and principal of BR Productions.

7.      Defendant BRP Records is, and at all times relevant hereto has been, is a limited liability company organized under the laws of the State of Wyoming, with a principal place of business located in Cheyenne, Wyoming.  Plaintiff is informed and believes that Russell is also the owner and principal of BRP Records.

8.      Plaintiff is informed and believes, and based thereon alleges, that the anonymous and fictitiously named Doe Defendants 1 through 10, inclusive, are either individuals or corporations acting in concert with the named defendants. Plaintiff is further informed and believes, and based thereon alleges, that Doe Defendants 1 through 10, inclusive, are individuals residing in various domestic locations who have advanced intentionally tortious and harmful schemes alleged herein in the State of Maryland. Hereinafter, all the defendants (including Doe Defendants 1 through 10, inclusive) will sometimes be collectively referred to as "Defendants."

9.      Plaintiff is presently unaware of the true names and capacities of Doe Defendants 1 through 10 who are sued herein, and therefore sues said defendants by only fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when their names and capacities have been ascertained. Plaintiff is further informed and believes, and based thereon alleges, that each of the fictitiously named Doe

Defendants 1 through 10, inclusive, is responsible in some manner for the occurrences, acts, and omissions alleged herein and that his extensive damages have been and continue to be proximately caused by their conduct.

10.     Plaintiff is further informed and believes, and based thereon alleges, that at all times material hereto, all Defendants, including Doe Defendants 1 through 10, inclusive, were and are agents, employees, partners, joint venturers, co-conspirators, owners, principals, and employers of each other, and at all times herein mentioned have acted within the course and scope of that agency, employment, partnership, conspiracy, ownership, or joint venture. Plaintiff further alleges based on information and belief that Defendants, and each of them, authorized, directed, and/or ratified the wrongful acts alleged herein and, consequently, they are jointly and severally liable to Plaintiff.

11.     Plaintiff is further informed and believes, and on that basis alleges, that at all times material hereto, all Defendants acted in concert with one another to commit the wrongful acts alleged herein, and aided, abetted, incited, compelled, and/or coerced one another in the wrongful acts alleged herein, and/or attempted to do so. Plaintiff is further informed and believes, and on that basis alleges, that Defendants, and each of them, formed and executed a conspiracy and/or a common plan pursuant to which they would commit the unlawful acts alleged herein, with all such acts alleged herein done as part of and pursuant to said conspiracy, intended to cause and causing Plaintiff harm.

## JURISDICTION AND VENUE

12.     Federal question jurisdiction exists because Plaintiff's First Claim for Declaratory Relief arises under the federal Copyright Act (17 U.S.C. § 101, *et seq.*).

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

there is diversity of citizenship and the amount in controversy exceeds $75,000.00. Diversity of

citizenship exists because Plaintiff and Defendants are citizens of different States.

14.     Accordingly, this Court has subject matter jurisdiction over the First Claim For

Relief pursuant to 28 U.S.C. §§ 1331, 1332, and/or 1338, and has supplemental jurisdiction over

the remaining claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to 28 U.SC. § 1391(b)(2) because, *inter

alia,* Plaintiff suffered substantial injury while residing in this District, and upon information and

belief, a substantial part of the events giving rise to the claims arose in this District, the negotiations

of the unfinalized and unsigned work for hire agreement at issue, and the creation of portions of

the subject master recordings in dispute.

## GENERAL ALLEGATIONS

16.     Rivera-Herrans is the prolific writer, composer, lyricist, and performer of the

theatrical musical work entitled *EPIC: The Musical* ("*EPIC*"). *EPIC* is a musical adaptation of

Homer's *The Odyssey* featuring 40 original songs solely authored by Rivera-Herrans (each, a

"Composition," and collectively, the "Compositions").  *EPIC* will ultimately feature nine sagas

that each contain several of the Compositions.  However, to date, only the first seven sagas have

been released.

17.     As alleged herein, Rivera-Herrans and Russell jointly created sound recordings of

the Compositions from the first two sagas of *EPIC* – entitled (1) *EPIC: The Cyclops Saga (Original

Concept Album)* and (2) *EPIC: The Troy Saga (Original Concept Album)* (collectively, the

"Master Recordings). In particular, Russell, acting through Defendants BR Productions and BRP

Records, hired individuals to perform and record certain portions of the Master Recordings, while

Rivera-Herrans personally contributed vocals, orchestrations, and other musical performances to comprise the other portions of the Master Recordings.

18.     Rivera-Herrans is not and never has been an employee of any of Defendants, nor has he even been compensated by Defendants for his work in connection with the Master Recordings. Accordingly, pursuant to the U.S. Copyright Act, for Defendants to own any sound recordings authored by Rivera-Herrans, there would need to be an executed written agreement stating that the recordings were works-for-hire. However, no such written agreement exists in connection with any recording of the Compositions, including the specific Master Recordings at issue in this action. Accordingly, Rivera-Herrans retained ownership over those portions of the Master Recordings that he personally performed and recorded, which he and Russell intended to be part of a joint work containing their respectively created portions.

19.     Further, Although Defendants have admitted to Rivera-Herrans that they have collected ***hundreds of thousands of dollars*** from their commercial exploitation of the jointly owed Master Recordings, they have inexplicably failed and refused to pay Rivera-Herrans his share of these funds.

**THE ORIGIN OF THE PARTIES' RELATIONSHIP**

20.     In 2016, Rivera-Herrans, then an 18-year-old freshman attending the University of Notre Dame, began writing his first musical, which was initially titled *Stupid Humans*.

21.     In 2017, Rivera-Herrans became the student and mentee of a professor at the University of Notre Dame, Matt Hawkins ("Hawkins"), who took an avid interest in meeting with Rivera-Herrans while he was composing *Stupid Humans*.

22.     In 2019, under Hawkins' mentorship, Rivera-Herrans gave his debut performance of *Stupid Humans* at the University of Notre Dame, which was met with a positive response and

which cemented Rivera-Herrans' conviction to become a successful creator of musicals.  Building

on the positive reception to *Stupid Humans,* Rivera-Herrans also started writing a second musical

– *EPIC*.

23.    During Rivera-Herrans' senior year, Hawkins met Russell at a musical theater event

and gave Russell a CD containing a demo recording of the songs from *Stupid Humans* (which by

that time had been renamed *My Heart Says Go*). After listening to the CD, Russell became

profoundly interested in Rivera-Herrans as a musical talent and decided to create a "Career Launch

Fellowship" (the "Fellowship") specifically for Rivera-Herrans.

24.    Russell then invited Rivera-Herrans to "apply" for the Fellowship (which,

unbeknownst to Rivera-Herrans at the time, did not have any legitimate application process). It

was not until several years later that Rivera-Herrans discovered that the Fellowship application

process was nothing more than a sham to make Rivera-Herrans feel "chosen" to work with Russell,

who had actually created the Fellowship based on his interest in working with Rivera-Herrans.

25.    In April 2020, Hawkins formally introduced Rivera-Herrans to Russell and his

business partner Matt Schicker ("Schicker") via a Zoom meeting. On that Zoom call, Russell and

Schicker introduced themselves as the owners and co-founders of a theater development consulting

firm that they called "Show Shepherd," and discussed the potential Fellowship with Rivera-

Herrans. Ultimately, Rivera-Herrans was "chosen" to receive the Fellowship.

26.    In June 2020, Rivera-Herrans started his new "Fellowship" with Show Shepherd.

Excited to receive dedicated feedback on his musicals from Russell and Schicker, whom he

understood to be musical theater professionals, Rivera-Herrans sent them a portfolio of his original

songs, including his songs from *My Heart Says Go* and *EPIC*.

27.     On June 22, 2020, three weeks into Rivera-Herrans' "Fellowship," Schicker sent Rivera-Herrans an email which included a proposed agreement concerning the Fellowship (the "Fellowship Agreement").  In that email, Schicker made clear to Rivera-Herrans on behalf of Show Shepherd (and therefore also Russell) that "[Show Shepherd] doesn't have any claim to participation in the future of any of your shows." The Fellowship Agreement, which was signed by Rivera-Herrans and Schicker, likewise did not purport to give any rights in Rivera-Herrans' creations to Russell, Schicker, or Show Shepherd. Nor did it include any terms that would render any of Rivera-Herrans' creations (which would subsequently include his contributions to the Master Recordings) works made for hire. Rather, the Fellowship Agreement simply gave Show Shepherd the right to use Rivera-Herrans' name and likeness for future promotional purposes – nothing more.[1]

28.     Accordingly, from the outset of Rivera-Herrans' relationship with Russell, it was always understood that neither Russell nor his business partners/companies would have any right to financially participate in Rivera-Herrans' creations.

## RUSSELL AND RIVERA-HERRANS JOINTLY CREATE THE MASTER RECORDINGS

29.     In 2021, Rivera-Herrans began posting clips of some of the songs from *EPIC* on the TikTok social media platform. As a result of those posts, Rivera-Herrans soon gained a

---

[1] A true and correct copy of the executed Fellowship Agreement is attached hereto as **Exhibit 1**.

substantial online fanbase for *EPIC*, with hundreds of thousands of people following his posts by the end of the year.

30.    It was during this time that Russell approached Rivera-Herrans (separate and apart from Show Shepherd) and expressed interest in personally producing *EPIC* as a full-fledged musical production.

31.    Throughout early 2022, Russell continued to pitch himself to Rivera-Herrans as a potential producer of *EPIC*. However, while Rivera-Herrans was not opposed to working with Russell (whom he trusted at that time as his mentor), he repeatedly expressed his concerns over the potential financial logistics of such an arrangement.  In response, Russell assured him that they would "figure it out."

32.    In March of 2022, Russell introduced Rivera-Herrans to an attorney named Nathan Sheffield ("Sheffield"), suggesting to Rivera-Herrans that Sheffield could be Rivera-Herrans' lawyer in connection with the negotiation of a formal production agreement between Russell and Rivera-Herrans concerning *EPIC*.

33.    Although Rivera-Herrans was highly skeptical of working with an attorney recommended by someone on the other end of a transaction, he nonetheless agreed to meet with Sheffield.  After that initial meeting, Sheffield told Rivera-Herrans that he had spoken with Russell's attorney, Lee Feldshon, and believed that if he was retained by Rivera-Herrans the negotiation process for an *EPIC* production agreement would be a swift process.

34.    However, to the contrary, after Rivera-Herrans retained Sheffield, the negotiation of a formal production agreement between Russell and Rivera-Herrans' respective attorneys dragged on for months, and no agreement was ever finalized or signed.

35.     All the while, without any finalized and signed agreement, Rivera-Herrans and Russell began working together to create the Master Recordings, which contained Rivera-Herrans' songs from the first two sagas of *EPIC*.

36.     In connection with the creation of the Master Recordings, Rivera-Herrans and Russell jointly created a timeline for the recording sessions, jointly scouted studios for the recording sessions, and jointly evaluated and met with potential directors, vocal coaches, vocalists, engineers, and other personnel for recording sessions. Critically, while Russell paid and hired (through his Defendant entities) some of the vocalists who performed on the Master Recordings, Rivera-Herrans was the exclusive writer and orchestrater for the entirety of the Master Recordings, the director and music director for a substantial portion of the Master Recordings, and (perhaps most importantly) performed the lead role of Odysseus and recorded his vocal parts (along with all of the accompanying orchestrations), all without any compensation from Russell. At all times, the understanding between Rivera-Herrans and Russell was that the Master Recordings would be a joint work.

### THE FAILED NEGOTIATIONS OF A WRITTEN WORK-FOR-HIRE AGREEMENT

37.     After the majority of the Master Recordings had already been recorded, and despite there still being no formal agreement in place between Russell and Rivera-Herrans concerning production of the Master Recordings, Russell sent Rivera-Herrans a proposed work for hire agreement which purported to designate Defendant BR Productions as the exclusive owner of all of the Master Recordings.

38.     To put it mildly, Rivera-Herrans was shocked when he received the proposed work for hire agreement. After all, up until that time, he was under the reasonable impression that he and Russell would jointly own the rights to the Master Recordings (consistent with their joint

efforts in creating the recordings) and trusted that any agreement proposed by Russell would reflect such joint ownership. Accordingly, Rivera-Herrans asked Russell to have a FaceTime call with him to discuss the issue of ownership.

39.     During their FaceTime call, Rivera-Herrans made it clear to Russell that he was worried about moving forward with finishing the Master Recordings until an acceptable ownership agreement was in place. In response, Russell once again flippantly assured Rivera-Herrans that "no matter what," they would "figure it out."

40.     On July 1, 2022, relying on Russell's representation that they could work out an acceptable ownership agreement down the line, Rivera-Herrans travelled to Los Angeles, California to finish recording his vocal parts for *EPIC*. However, during those recording sessions in Los Angeles, Russell continued to bring up the proposed work for hire agreement, insisting that Rivera-Herrans sign it as is.

41.     On July 26, 2022, after growing weary of Russell's attempts to get him to sign the proposed work for hire agreement, Rivera-Herrans contacted the Dramatists Guild and asked their advice about the agreement (which is a service they offer to their members). The Dramatists Guild strongly discouraged Rivera-Herrans from signing the agreement as it existed, and recommended that he seek new legal counsel (*i.e.,* someone other than the lawyer who had been referred to him by Russell). However, on or around August 1, 2022, after Rivera-Herrans told Russell that he would be looking for new counsel, Russell concerningly told Rivera-Herrans that he did not want him to "waste his time" finding a lawyer.

42.     On August 2, 2022, Rivera-Herrans and Russell had another Zoom call to discuss the ownership of the Master Recordings. On this call, Rivera-Herrans made clear that he was still interested in working with Russell to finish the Master Recordings, but he would need to retain a

joint ownership interest in the recordings, as had always been their understanding. He also made clear that he would need a new lawyer (not referred by Russell) to negotiate the terms of a proper co-ownership agreement.

43.     Rivera-Herrans subsequently engaged new counsel to represent him in connection with the rights to the Master Recordings. However, despite his new counsel's attempt to negotiate a reasonable agreement with Russell, there was no written agreement in place by the time the first half of the Master Recordings (containing the songs from the first *EPIC* saga) were released on December 25, 2022. Nor was there an agreement in place when the second half of the Master Recordings (containing the songs from the second *EPIC* saga) were released on January 27, 2023.

44.     Throughout January of 2023, Russell and Rivera-Herrans (through their respective attorneys) continued their efforts to negotiate an agreement concerning the rights to the Master Recordings. However, Russell persisted in demanding more than what he was entitled to given the joint creation of the Master Recordings. For example, Russell unreasonably demanded rights in connection with future works that might be created by Rivera-Herrans, even if those works had nothing to do with *EPIC* or the Master Recordings. Rivera-Herrans viewed these efforts by Russell to claim rights in future works as a betrayal and Russell's unwillingness to compromise made him deeply uncomfortable.

**RUSSELL'S INTERFERENCE WITH RIVERA-HERRANS' ATTEMPTS TO RELEASE ADDITIONAL SAGAS OF *EPIC***

45.     Based on the success of the Master Recordings containing the first two sagas of *EPIC,* multiple record labels contacted Rivera-Herrans to discuss potentially recording and releasing the future sagas. Since Rivera-Herrans undisputedly owned the rights to all of the Compositions, and since he had not reached any acceptable agreement with Russell concerning future sagas of *EPIC,* he had no obligation to work with Russell in connection with recording those

sagas. Accordingly, Rivera-Herrans (through his new counsel) attempted to negotiate a record deal that would allow him to record and release the future *EPIC* sagas on his own.

46.     However, Russell obnoxiously attempted to hijack Rivera-Herrans' efforts to release additional *EPIC* sagas.  Among other things, Russell threatened that, if Rivera-Herrans did not immediately enter into a work for hire agreement on Russell's preferred terms, Russell would reach out to the record labels with whom Rivera-Herrans' was negotiating and falsely tell them that Russell (and Russell alone) owned the rights to all future recordings of *EPIC*.  Russell also outrageously threatened to sue Rivera-Herrans for complete ownership of the Master Recordings and all future recordings of *EPIC* if Rivera-Herrans would not sign an unreasonable work for hire agreement.

47.     In October 2023, in a further effort to frustrate Rivera-Herrans' ability to release and promote future sagas of *EPIC*, Russell went so far as to lock Rivera-Herrans out of the *EPIC* social media accounts that Rivera-Herrans himself had created, including but not limited to TikTok, Instagram, and Twitter. Russell also reached out to one of the recording engineers who had been working with Rivera-Herrans on the third saga of *EPIC* and demanded the turnover of the stems from those recordings. In making this demand, Russell said he intended to release the third saga without Rivera-Herrans' consent or participation. Thankfully, the engineer did not cave to this outrageous demand.

## RUSSELL'S ILL-FATED NEW YORK LAWSUIT

48.     On November 7, 2023, press outlet Bloomberg contacted Rivera-Herrans asking for comment on a lawsuit that Russell's entities, BR Productions and BRP Records, had apparently

filed against Rivera-Herrans in the Southern District of New York (Case No. 23-cv-9816) the day before, November 6, 2023 ("New York Lawsuit"). This was how Rivera-Herrans first learned that Russell had sued him.

49.     In the New York Lawsuit, BR Productions and BRP Records improperly and without any factual basis claimed to be the sole authors and owners of the Master Recordings and also claimed to have the exclusive right to record and release all future sagas of *EPIC*.

50.     Critically, Russell's claims of ownership in the New York Lawsuit were premised entirely on the proposed terms of the work for hire agreement that Rivera-Herrans had rejected and refused to sign. Russell apparently had the ill-advised thought that filing a lawsuit against Rivera-Herrans might finally cause Rivera-Herrans to sign that proposed work for hire agreement. To the contrary, Rivera-Herrans indicated to Russell that he intended to zealously defend against the New York Lawsuit, and that he would also be bringing his own claims against Russell.

51.     On January 11, 2024, just before Rivera-Herrans' deadline to respond to the New York Lawsuit, Russell voluntarily dismissed the lawsuit – thus demonstrating that the filing of the lawsuit was nothing more than a bad faith tactical maneuver (albeit one that did not yield the intended result for Russell).

**RUSSELL'S FRAUDULENT COPYRIGHT REGISTRATION AND FAILURE TO PAY RIVERA-HERRANS IN CONNECTION WITH THE MASTER RECORDINGS**

52.     Despite the undeniable fact that the Master Recordings of the first two *EPIC* sagas were co-authored by Rivera-Herrans (who, as Russell is aware, personally performed and recorded a substantial portion of the Master Recordings and who never signed any agreement granting his rights in those portions to anyone else), Russell has fraudulently filed copyright registrations which claim that the Master Recordings are owned entirely by BRP Records as purported works for hire.

14

53.     Moreover, despite admitting to Rivera-Herrans that he has received hundreds of thousands of dollars from the exploitation of the Master Recordings, Russell has refused to pay any of that money to Rivera-Herrans – even though he knows that Rivera-Herrans is a joint author of the Master Recordings and thus entitled to 50% of the revenues therefrom.

## FIRST CLAIM FOR RELIEF

### (For Declaratory Judgment Against All Defendants)

54.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 54, inclusive, of this Complaint as if fully set forth herein.

55.     An actual and present controversy exists between Plaintiff and Defendants regarding Plaintiff's status as a co-author and a co-owner of the Master Recordings. Defendants deny recognition of Plaintiff's status as a co-author and co-owner of the Master Recordings, which entitles Plaintiff to writer credit and a *pro rata* share of all of the revenues that have been generated by the exploitation of the Master Recordings.

56.     Plaintiff contends that he and Defendants are co-authors of the Master Recordings. Plaintiff and Defendants jointly contributed separate and distinct copyrightable elements to the Master Recordings. Moreover, each of them possessed the independent creative control over their respective contributions to them.

57.     Plaintiff and Defendants each manifested an intent to be co-authors of the Master Recordings, and worked together jointly to create the Master Recordings.

58.     Plaintiff contributed significantly to the Master Recordings, including but not limited to coordinating the recording of them, as well as arranging, composing, directing, music directing, melodizing, harmonizing, vocalizing, and acting in them.

59.     An actual and present controversy exists regarding the parties' respective rights to the Master Recordings. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff is entitled to a declaration of rights as follows: (a) Plaintiff is a co-author and co-owner of the Master Recordings; (b) Plaintiff is entitled to a co-author and co-owner credit on the copyright to the Master Recordings; and (c) Plaintiff is entitled to prospective and retroactive royalties and other funds owed for his interest in the Master Recordings.

## SECOND CLAIM FOR RELIEF

### (For Accounting Against All Defendants)

60.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 60, inclusive, of this Complaint as if fully set forth herein.

61.     As co-author and co-owner of the copyright of the Master Recordings, Plaintiff is entitled to his *pro rata* share of the profits that Defendants have enjoyed from the exploitation of the Master Recordings.

62.     By commercially exploiting the Master Recordings without accounting to Plaintiff for the profits, Defendants have wrongfully deprived Plaintiff of his rightful share of income therefrom.

63.     Defendants are in sole control of the books and records related to the income derived from the Master Recordings, which are needed to ascertain the amounts due to Plaintiff pursuant to their special relationship as co-authors and co-owners of the Master Recordings. Plaintiff has no alternative means by which he can assemble the information necessary to calculate what is owed to him by Defendants.

64.     Plaintiff is entitled to an order of this Court directing Defendants to render a complete and honest accounting of all revenues derived from all exploitations of the Master

Recordings and all sums due to Plaintiff and to pay Plaintiff the sums shown due by such accounting.

## THIRD CLAIM FOR RELIEF

### (For A Constructive Trust Against All Defendants)

65.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 52, inclusive, of this Complaint as if fully set forth herein.

66.     By virtue of the foregoing, any interests that Plaintiff has in the Master Recordings, and any and all profits received by Defendants from the commercial exploitation of the Master Recordings, are the property of Plaintiff and Defendants in equal shares.

67.     Defendants have wrongfully deprived Plaintiff of his share of the profits that they have enjoyed from the commercial exploitation of the Master Recordings.

68.     By virtue of Defendants' acts, Defendants hold the profits derived from the exploitation of the Master Recordings as constructive trustees for the benefit of Plaintiff and Defendants.

69.     Plaintiff is entitled to immediate possession of his *pro rata* share of the profits held by Defendants as constructive trustees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     That the Court declare that as follows:

   a.     Plaintiff is a joint author and has a joint ownership interest in the Master Recordings;

   b.     Plaintiff is entitled to a co-author and co-owner credit on the copyright to the Master Recordings; and

      c.       Plaintiff is entitled to prospective and retroactive royalties and other money owed with respect to his respective interest in the sound recordings and compositions of the Master Recordings, in a percentage to be proven at trial;

2.       That the Court order an accounting of all revenues derived from the exploitation of the Master Recordings by Defendants and order that Plaintiff be paid his share of those revenues;

3.       That the Court impose a constructive trust over the proceeds from the exploitation of the Master Recordings pending the final disposition of this action;

4.       That Plaintiff recover his costs of this lawsuit, including an award of reimbursement of reasonable attorneys' fees, pursuant to Section 505 of the U.S. Copyright Act (17 U.S.C. § 505);

5.       For interest in the maximum amount allowable by law; and

6.       For such other and further relief as the Court deems to be just and proper.


Dated: December 18, 2024               Respectfully submitted,

*/s/ Kyra L. Wheatley*
Kyra L. Wheatley
Bar No. 30779
Hyatt & Weber, P.A.
200 Westgate Circle, Suite 500
Annapolis, Maryland 21401
Phone: 410-260-0626
Email: KWheatley@hwlaw.com

*Counsel for Plaintiff*

*/s/ David B. Jonelis*
David B. Jonelis
Bar No. 265235
Lavely & Singer, P.C.
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Phone: (310) 556-3501
Email: djonelis@lavelysinger.com

/s/ Max D. Fabricant
Max D. Fabricant
Bar No. 333859
Lavely & Singer, P.C.
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Phone: (310) 556-3501
Email: mfabricant@lavelysinger.com

*Co-Counsel for Plaintiff, pro hac vice admission pending*

## DEMAND FOR JURY TRIAL

Plaintiff Jorge Rivera-Herrans requests a trial by jury on all issues raised herein.

/s/
Kyra L. Wheatley